## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DESIGN WITH FRIENDS, INC. and | ) | |
| DESIGN WITH FRIENDS LTD. | ) | |
| | ) | No. 1:21-cv-01376-LPS |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | **Jury Trial Demanded** |
| TARGET CORPORATION, | ) | |
| | ) | |
| Defendant. | | |

## SECOND AMENDED COMPLAINT

This is a second amended complaint for copyright infringement and breach of contract. Plaintiffs Design With Friends, Inc. and Design With Friends Ltd. (individually and collectively referred to herein as "DWF") bring this action against Target Corporation ("Target") and state as follows.

## NATURE OF THE ACTION

1.      This action arises from Target's blatant copying of DWF's unique and creative online nursery room design tool expression (the "DWF Design Tool"), which DWF launched in 2018.

2.      Dozens of Target employees and representatives at different locations have been active on the DWF Design Tool since at least as early as the fall of 2019, logging hundreds of hours of session time by users including product designers, art directors, UX/UI designers, senior CGI artists and more checking and sharing with each other the elements of the DWF Design Tool user experience and application and conducting stress tests to reverse engineer.

3.      After systematic mining of DWF's website by numerous Target employees over the course of many months – many instances of which have been recorded by DWF – Target launched its own design tool at the exact adapt-or-die May 2020 moment for furniture sales when sales plummeted only to recover by shifting 35% of all nursery industry sales to online sales, a paradigm shift which is forecasted to continue even after post-pandemic life (and indeed at least one of the involved Target employees bragged drove over $100 million in sales in 2022 alone). As a result of Target's prior and ongoing misconduct, even following formal notice of DWF's claims, DWF files this action seeking damages and preliminary and permanent injunctive relief for copyright infringement under the Copyright Act of 1976, as amended, 17 U.S.C. §§ 101 *et seq* and breach of DWF's Terms of Use pursuant to Delaware state law.

4.      The concept or idea of the DWF tool is an interactive room-designing software program for lay customers.

5.      The DWF Design Tool implements the above-stated idea in a creative and specific manner resulting in a unique work with a distinctive visual appearance and expression. The design choices for the DWF tool are the result of numerous, successful, discretionary, creative choices to design a product that offers an enjoyable user experience that is also aesthetically pleasing and appeals to users' subconscious mind expressed as a game-like environment that often values user feelings or mood over function, unlike any other room design tool available at the time.

6.      There are virtually no limitations to the visual expressions that can be used to embody a software program's user interface and visual appearance. While the design of a software program for the specific purpose of creating room designs is somewhat constrained by the bounds of reality – i.e., there must be a room and access to interior design elements – the particular visual expression of the user interface can take many forms.

7.     The DWF Design Tool visual expression comprises a unique "look and feel," and is comprised of a large number of expressive elements for which visual design choices are independent and distinct from functional choices, and could have been visually expressed in a variety of ways regardless of underlying functionality.

8.     Other online design tools offer implementations of similar virtual room design ideas and have experienced success without utilizing the unique visual appearance and expression of the DWF Design Tool. Third party competitive room design programs that overlap in purpose with the DWF tool are visually distinct from the DWF tool and illustrate the many ways in which a software program can be visually expressed while remaining functional for its intended purpose.

9.     The visual expression – of expressive elements relating to underlying functionality that could easily be visually expressed in a variety of ways – of the Target Design Tool is virtually identical to the visual expression of DWF. The Target tool shares substantial similarity and virtual identity in the program structure, and the look of DWF's user interface.

10.     The Target tool creates substantially the exact same distinct visual user experience as the DWF tool, sharing virtually identical (and far above substantially similar) "look and feel" tapping into the conscious and subconscious wants and needs of the users DWF began targeting in 2018.

11.     Target's edits to DWF's tool are inconsequential and do not deprive the tools of the virtual identicality and substantial similarity in their design and overall look and feel of the interfaces.

12.     Based on enormous similarities, and documentation of Target's access to and the Target Design Tool's match with of DWF's Design Tool, the only reasonable conclusion is copying; copying which far exceeds substantial similarity of the two designs.

13.     The type of reverse engineering and copying seen here falls outside industry standards for competent UI/UX design. It is clear that Target had access to and was familiar with the DWF Design Tool when they made their own room planner, in violation of many provisions in DWF's Terms of Use

14.     Target unmistakably seeks to use the expression of DWF Design tool for commercial purposes directly overlapping DWF's commercial purposes.

## PARTIES

15.     Design With Friends, Inc. is a Delaware corporation with a registered agent address at 1313 N Market St Ste 5100, Wilmington, DE 19801.

16.     Design With Friends Ltd. is a privately-held Israeli company with a principal place of business at 50 Ramat Yam, Herzliya, Israel 4685150, IL.

17.     Target is a Minnesota company headquartered at 1000 Nicollet Mall, Minneapolis, Minnesota 55403.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction over DWF's federal claim for copyright infringement under 28 U.S.C. §§ 1331, 1338(a), and supplemental jurisdiction over DWF's state law breach of contract claim, which arises out of the same case or controversy as DWF's copyright infringement claim, pursuant to 28 U.S.C. § 1367(a).  This Court also has diversity jurisdiction under 28 U.S.C. § 1332 because there is complete diversity between all parties, they are citizens of Delaware, Minnesota and Israel, respectively, and the amount in controversy far exceeds $75,000, exclusive of interest and costs.

19.   This Court has personal jurisdiction over Target because Target is subject to general jurisdiction in the State of Delaware.  Target has established minimum contacts with this forum. Target owns and operates at least three retail stores within this Judicial District and regularly and

systematically transacts business within this District.  Target maintains a fully interactive web site, www.target.com, whereby it makes available the infringing content that is the subject of this action to customers located in Delaware and this Judicial District.  Further, Target has waived any personal jurisdiction challenge by not timely raising it.

20.     Venue is proper in this district under 28 U.S.C. § 1391 (b)(1), (b)(2), (c)(2) and § 1400(a) because this Court has personal jurisdiction over Target in this district, Target transacts business within this District, Target or its agents may be found in this district, and a substantial part of the events or acts giving rise to the claims occurred in this district, and Target has waived any challenge to proper venue by not timely raising it.

## FACTUAL ALLEGATIONS

### DWF and its Copyrighted Nursery Design Tool

21.     DWF was formed as a startup venture in late 2017, envisioning creating a more consumer-friendly, instantly-usable 3D nursery room design program that could be used on the computer or smart phone.

22.     Although there are numerous ways to achieve useability and accessibility, DWF's goal was elegant in *design*, yet ambitious in execution – provide a signature visual display for a nursery planner tool initially, and then expand the website, using that signature design and look to allow for creating the furniture layout of an entire home, including outdoor spaces and non-home spaces such as dormitories.

23.     Interface designers regularly compete to engage consumers through not only useability and functionality, but subjective characteristics that draw them in and helps them know (a) where they are, (b) what they can do, and (c) what they just did. Much of the work and creative expression contribution is crafting an environment that subconsciously and uniquely appeals to

users and creates differentiation in a marketplace where many interfaces serve the same or similar underlying purpose.

24.     Creating a 3D planner, let alone one designed to provide an intuitive and seamless experience, and further a mobile-friendly version, was and is a complex endeavor to achieve.  The creative and expressive design choices were endless, with countless details to work through, lots of user testing, and many hours spent working through every detail.  The design choices implemented for the DWF Design Tool were original, expressive, unique, and discretionary in that the operation of the DWF Design Tool could have been achieved with very different design.  The Tool's design required substantial creative input, including the unique combination of these design elements to cohere to form an overall look and feel.  Many of the discretionary visual design choices sacrificed "function" in favor of aesthetic and subconscious user appeal.  The design and development occupied an entire development team's full time.

25.     The DWF Design Tool interface constitutes a discretionary and creative visual expression, as validated by the wide variety of competitor tools that bear little to no visual similarity to the DWF Design Tool. *See* Declaration of Mauro Sica ("Sica Decl.") (attached hereto and incorporated by reference); Declaration of Eric Bear ("Bear Decl.") (attached hereto and incorporated by reference). As explained in those declarations and discussed below, the Target Tool is virtually identical and substantially similar to the DWF tool in its protectible content, including copying of multiple non-functional aspects of the DWF tool, well the unique combination of features and the tool's expressive look and feel.  Also, as further confirmed by the experts, under a comparison of the DWF Tool and Target Tool to known third party room design applications  (1) many copied aspects of the DWF Tool are non-functional (e.g., they are not used in the third party applications to achieve particular functions and third party applications use

multiple different design to achieve various designs), (2) the DWF Tool and Target Tool are substantially similar in multiple key non-functional aspects, and (3) this differs significantly from third party applications that did not copy DWF.

26.     As noted above, these attached declarations are incorporated herein by reference. *Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249, 257-258 (5th Cir. 2005) ("[N]either the district court, nor we, can conduct a battle of experts on a motion to dismiss…Here, the plaintiffs alleged with particularity [allegations] adequately supported by expert opinion."); *Kajeet, Inc. v. Gryphon Online Safety, Inc.*, 2021 U.S. Dist. LEXIS 37473, *18-19, 2021 WL 780737 (D. Del. Mar. 1, 2021) (complaint and incorporated expert report attached to it plausibly demonstrated unconventional nature of infringed features); *In re CommVault Sys., Sec. Litig.*, 2016 U.S. Dist. LEXIS 135257, *13-14 (D.N.J. Sept. 30, 2016) (complaint may attach expert declarations).

27.     DWF spent substantial amounts of time, money, and effort creating and compiling its DWF Design Tool content, including but not limited to paying special attention to the "look and feel" of the website to connect with DWF users' subconscious, establish the trust of DWF's users, to create a signature visual identity that resonates and works to identify to DWF's users that they are on DWF's site, with an underlying business-side goal to drive sales through the DWF website and to attract business partners to engage with DWF.

28.     The purpose or function of a utilitarian work may be termed the work's idea, whereas everything that is not necessary to that purpose or function is part of the copyrightable expression of the idea.  The "idea" of the DWF Design Tool is a virtual room that allows users to create interior design renderings, or put another way, the "idea" of an interactive room-designing software program for lay customers. In the DWF Design Tool, the idea of designing a room is expressed in a creative and specific manner with a distinctive visual appearance, or expression,

which includes the features below, amongst others. The individual elements addressed below comprise many of the most relevant features of the DWF Design Tool that provide it with a unique look and feel (particularly in comparison to competitors) that can be described as clean, effortless, inviting, emotionally engaging, and with a warm, game-like social and fun quality.

29.     The DWF Design Tool, from the outset of a user's experience, visually presents a look and feel that is clean, effortless, inviting, emotionally engaging, and with a warm, game-like social and fun quality. Users are not required to make any selections before they are prompted with the interface shown below, comprised of a minimal, clean, monochromatic menu on the left side of the screen, and a light, airy, floating default 3-dimensional view of a square empty room for creating room designs. The graphics of the opening interface presentation are semi-realistic in the way that mid-grade movie animation approaches realism without being mistaken for live action. The presentation presents the user with an immediately immersive and interactive feeling, as though they have been dropped into a game and invited to go to work. There are no menu overlays obscuring the design space, and the few additional buttons on the screen simply invite saving (so a user can return to their game) and sharing (so a user can interact within the program with others). *See* Bear Decl. ¶ 59.



30.     When a user begins to explore the design options in the left side menu, a streamlined grid of options are provided from which the user can "click to apply" components and characteristics to the design space.  As shown below, an alternative flooring material has been selected and thereby loaded into the default room on the right. *See* Bear Decl. ¶ 60.



31.     Focusing particularly on the default room portion of the primary interface, DWF chose to offer a 3D room view in the specific manner shown below.



32.     In line with the clean, approachable, streamlined visual that DWF was looking to portray, the above image constitutes deliberate design choice. The room is outfitted by default with

walls that have no width, a single door and a single window, baseboards, flooring, no ceiling, a particular user perspective and angle looking inward at a corner of the room with exactly two exterior walls visible and exactly two exterior walls invisible, all floating in a void space with no orientational reference point like a plane, grid, horizon, etc.  *See* Bear Decl. ¶ 62.

33.    Next, focusing particularly on the menu portion of the primary interface, DWF chose to implement a single, unified menu panel on the left side of a user's screen that does not overlay, distort or otherwise obscure the design space on the right to impart a feeling of organization and open access.  Items from the menu are not dragged and dropped into the design space but kept distinct, thereby allowing users to simply click or tap a menu item and have it appear – as though by magic (surrounded, in fact, by a sparkling animation) – in the room featured in the design space on the right. Higher level menu categories appear in a clean, monochromatic color scheme labeled with simplified line drawings, while individual menu options are displayed organized on a secondary grid.  *See* Bear Decl. ¶ 63. Representative images of the look and feel of the DWF Design Tool menu follow:




34.     The default room is largely optionless in its streamlined framework, as there is no ability to create a variety of room shapes, curved walls, any angle of intersection beyond 90 degrees, or any other complex design elements. However, consistent with its clean, minimal, and organized aesthetic, the DWF Design Tool provides a "Resize Room" option within the left side menu that has four editable dimension boxes and radio buttons to select from among fixed ceiling height choices. The only units of measure provided are imperial (foot/inches), not metric (meter/centimeters). When the user changes the values in the dimension fields, the default room is automatically updated. *See* Bear Decl. ¶ 64.



35.     Another part of a user's interactive experience and likely subconscious enjoyment of the DWF interface is the manner in which objects are placed and moved within the design space. Again, consistent with the DWF Design Tool's overall look and feel, object interaction is smooth and streamlined, in an immersive, game-like presentation environment. This object interaction is not a "default" or an industry-standard, but intentionally crafted by an interface design team with thoughtful consideration to user perception and user behavior.  There is no one "right" answer for

how to best implement interactivity, and the below are several highlights of DWF's intentional design choices. *See* Bear Decl. ¶ 65.

36.     When menu items are clicked or tapped, they appear in the room to the right. As shown below, selecting the object within the design space (by clicking or tapping on it) displays a temporary in-context object menu that again reflects DWF's minimalist and streamlined overall look.   Arrow buttons on the in-context object menu are situated below the object; here, two opposing arrows. The arrow buttons may either be clicked or tapped repeatedly to achieve minor movements of the selected object or held for a long press to effectuate a continuous rotation of the object. *See* Bear Decl. ¶ 66.



37.     In addition, the walls of the room establish a visible object movement boundary, wherein objects cannot venture outside of, intersect or otherwise break through the walls. Regardless of where the user attempts to drag an object, it will only move within the room or glide along the walls. *See* Bear Decl. ¶ 67.



38.     DWF implemented wholly optional discretionary visual effects for object interaction with other objects. For example, décor items like pillows and toys are designed to automatically layer *on top of* graphics for things like rugs, tables, and chairs as in the image below showing a pillow on a chair.  When a user drags an object like a pillow around the room, it visually appears to magically "jump" up vertically in an instant and rest on top of the supporting object (e.g. a chair) below it. *See* Bear Decl. ¶ 68.



39.     Further in line with DWF's streamlined and minimalist, game-like look and feel, DWF implemented the below three-part user guide. While it has some color, the overall palette

remains relatively neutral, and the design aesthetic is semi-realistic but also more cartoon-like and abstract than the program itself.   Although comfortable and unintimidating, the information provided is fairly limited. *See* Bear Decl. ¶ 69.



40.     By early April 2018 the DWF Design Tool had come online for desktop only. It enjoyed early success, receiving outstanding reviews and comments, with constant improvements well into 2019.  By late 2018, DWF launched a mobile friendly version of the DWF Design Tool, which is a format that also caters toward non-professional users.

41.     DWF made the online DWF Design Tool accessible and useable via a mobile web browser.  Users can access the DWF website on their mobile phones to benefit from the distinctive features of the DWF Design Tool, although certain aspects of the visualization were deliberately altered for the vertically organized mobile interface. As shown below, the basic elements of the website remain – a design space with the same default room and a menu that does not obscure the design space.  In contrast to the desktop web version, the menu appears at the bottom of the screen, and when expanded pushes the design space upward on the screen without obstructing it; simply making it smaller and reducing its visual footprint.  Menu options appear with the same visual

impression as the desktop web version using monochromatic, illustrated abstract icons, in predictable grid layout. *See* Bear Decl. ¶ 70.



42.     The overall game-like and minimalist look and feel of the DWF interface visualization shown above is not in any way required to achieve a functioning room design tool, and the overall presentation above is one of discretionary design choice by DWF employees attempting to create a unique virtual environment. While certain elements underling the tool may be helpful to creating a certain type of interactive website in general, the shape, form, and appearance of those elements need not be the same as DWF.  Rather than being necessary, these were instead <u>expressive</u> choices made to cause the DWF Design Tool look a particular way. *See* Bear Decl. ¶ 71.

43.     An appreciable number of users do in fact recognize the look and feel of the DWF Design Tool interface as a unique and distinctive identifier for DWF's services.  For example, DWF was contacted by an executive from major home retailer Williams Sonoma, VP of Technology for Mobile Apps, E-commerce, Stores & Innovation, who conveyed that the DWF

Design Tool and Target's accused websites (detailed further below) were so similar that they believed DWF was powering Target Design Tool. *See, e.g.* Bear Decl., ¶ 129.  Thus, instances of actual confusion between the two tools further demonstrate the virtual identity and substantial similarity between DWF and Target's Infringing Design Tools.

44.     The DWF Design Tool has received positive unsolicited press coverage, including for example by Pregnancy and Newborn Magazine – which itself has monthly readership of one million people and is a top magazine for moms-to-be since 2006 and is the second-highest ranked baby magazine based on web traffic, social media followers and other criteria.

45.     Demonstrating its unique look and feel resonates with the users' subconscious and is widely recognized for its expressive distinctness, the DWF Design Tool regularly receives praise directly from users and publicly from users online, for example, on social media and in popular forums like What to Expect – a web community built by the team behind the paramount pregnancy and birth guidebook, *What to Expect When You're Expecting*, which enjoys approximately 11 million monthly visits and is in the Top 60 health websites in the world.

46.     The DWF Design Tool drives sales of various consumer products by allowing furniture and other nursery items to be added to a mock room with the click of a button with a default of closest proximity toward the center of the room, and then dragged and dropped around the room in different locations and orientations.  These are not generic items but are actual items available from included stores shown in the selection tab of the DWF Design Tool with pictures, pricing, and other details.

47.     The items render in a 3D depiction in the room, and if satisfactory the consumer simply adds the item to a registry.

48.     Viewing the registry allows the user to see reviews, compare prices at included retailers, and click to purchase the item from the desired retailer.  Retailers have included, for example, Houzz, Walmart, Amazon, Etsy and Target.

49.     DWF's business model has a number of sources of revenue, including revenue from the ultimate click-through purchase of products by the consumer using the DWF Design Tool and customizing the DWF Design Tool for use directly by retailers on retailer website.

50.     DWF is the owner of a valid copyright, Registration No. VA0002268121, for the DWF Design Tool as it appeared and was published in October 2019, titled "Designwithfriends.com Website 2019 Version." A true and correct copy of proof of registration and the deposit for this registration are attached hereto as **Exhibit A**.

51.     DWF is the owner of a valid copyright, Registration No. TX0009001011, for the DWF Design Tool computer program published in October 2019, titled "Design with Friends Editor (2019)."  A true and correct copy of this copyright registration is attached hereto as **Exhibit B**.

52.     DWF created its 2019 DWF Design Tool forming the basis of the copyright registrations attached as Exhibits A and B in Israel and released it from Israel on October 17, 2019.

53.     DWF is the owner of a valid copyright Registration No. VA0002268133, for the DWF Design Tool as it appeared and was published in July 2020, titled "Designwithfriends.com Website 2020 Version." A true and correct copy of proof of registration and the deposit for this registration are attached hereto as **Exhibit C**.

54.     DWF is the owner of a valid copyright, Registration No. TX0009001026, for the DWF Design Tool computer program published in July 2020, titled "Design with Friends Editor (2020)."  A true and correct copy of this copyright registration is attached hereto as **Exhibit D**.

55.     DWF created its 2020 DWF Design Tool forming the basis of the copyright registrations attached as Exhibits C and D in Israel and released it from Israel on July 13, 2020, which is a derivative work of the original DWF Design Tool.

56.     The foregoing copyright registrations constitute *prima facie* evidence that the material therein is copyrightable and owned by DWF.

57.     Collectively, DWF's above-referenced copyright registrations are referred to as the "DWF Design Tool Works."

58.     The DWF Design Tool Works are foreign works including all original related works by DWF and DWF owns copyrights in all modifications made from the release date forward.

**Target and its Infringing Conduct**

59.     In or around June 2020, a DWF board member emailed an executive at a popular home goods retailer and mentioned DWF and the DWF Design Tool.  The executive replied to the email and asked, "That's interesting .. is this powering targets nursery?" believing that the tools were very similar. The executive further stated "The target experience is very similar to their[s] so I felt that its powered by them."  *See, e.g.* Bear Decl., ¶ 129.  This began a detailed internal investigation.

60.     The investigation was startling in its revelation of the blatant nature of Target's misconduct, showing how Target used its copying of the DWF Design Tool in order to arrive at warp speed to the market with their own plagiarized room design tool (the "Infringing Design Tool") to protect and expand revenues as the pandemic and lock-downs raged on.

61.     There are near infinite ways to visually represent a room design tool without using the precise visual structure, color scheme, flow, and overall visual effect that DWF crafted. In fact, there are myriad ways to convey a room design tool that could be considered functional

18

*improvements* over the DWF Design Tool, which provides only one room, limited customization options, a limited set of tools and controls, limited user guidance, and no 2-dimensional viewing option. *See, e.g.* Bear Decl., ¶ 72.

62.    The overlapping look and feel of the DWF Design Tool and the Infringing Design Tool is overwhelming, and they are more than substantially similar to one another.  The similarities include both how the design of the DWF Design Tool looks visually and the unique visual design of things like movements within the DWF Design Tool – similarities that Target copied while ignoring the plethora of design alternatives and variations that could and would have been employed if copying had not taken place. Sica Decl., pp. 8-43; Bear Decl., ¶¶ 73-77; 123-132

63.    Target's designers gave sycophantic deference to DWF's expressive elements to the same extent as designers of a derivative work would do, which the Infringing Design Tool clearly is. Sica Decl., p. 43.

64.    The opening interface presentation of the Target Design Tool (unlike competitor tools) is visually nearly indistinguishable from DWF's interface, as shown in turn below. *See, e.g.* Bear Decl., ¶ 133.





65.     Both display the same the look and feel identified above: clean, effortless, inviting, emotionally engaging, and with a warm, game-like social and fun quality. Users are not required to make any selections before they are prompted with the interface shown above, comprised of a minimal, clean, monochromatic menu on the left side of the screen, and a light, airy, floating default 3-dimensional view of a square empty room for creating room designs. The graphics of the opening interface presentation are semi-realistic in an animation-style rendering that approaches realism without being mistaken for photo-realism. The presentation presents the user with an immediate immersive and interactive feeling, as though they have been dropped into a game and invited to go to work. There are no menu overlays across the design space, and only a few additional buttons on the screen. *See, e.g.* Bear Decl., ¶ 34.

66.     The format of the DWF tool's 3D space described above is not necessary to its function as a room planner, and in fact is not functionally ideal (or nearly ideal) or even a functional improvement.  DWF's tool is ultimately a minimalist design that would be far more functional with significant additions, such as command buttons dedicated to switching to a 2D flat view (technically 2D parallel projection view), "undo" operations, "copy" objects or visualization

settings (shading/rendering) preferences, etc.  Users are only presented with a single arrangement of a 3D room in a particular view or perspective with a muted color scheme and no surrounding context, and resizing the room is constricted to rectangular dimensions. Sica Decl., p. 9.

67.     In third party tools, and unlike DWF's Design Tool and the Infringing Design Tool, where the room floats in a void, in most tools the physical object such as a room is placed on a flat base plane - which is either textured, divided on a grid or simply colored. While rotating the camera, the horizon will be visible. Third party tools also offer the option to turn on the X, Y, or Z axis, or the shadows, in addition to the default diffuse lighting. Sica Decl., pp. 9-10 For example:



Planner 5d in 3D viewing mode (base plane with grid)



Sketchup's gray base plane with horizon, with X (red), Y(green), Z(blue) axis and shadows

68.     Moreover, most third-party tools include many more command buttons and overlaying menu options. Sica Decl., p. 10. For instance, "Homestyler" (below) includes the following command buttons in the 3D space area (excluding the four menus):



"Homestyler" is an example of a typical competitive room designing tool with about forty buttons on the home screen and four additional side menus providing an array of different tools and a "blank slate" (e.g. no default) to build a customized design:



69.     Many third-party tools begin in a 2D flat space (2D parallel projection) rather than a real-time 3D space. Most third party tools also provide the option of switching to a 2D flat view, which DWF does not offer but which is more functional from an interior design perspective in terms of precisely positioning the furniture inside. Sica Decl., pp. 11-12. From the top, DWF's visual expression (below left) offers only a perspective view while most third-party tools provide more options (below right):

 

Another competitor tool, Planner 3D, likewise starts in a visually dissimilar 2D space, although with relatively simple graphics.



Rommstyler operates in 2D with the option to take 3D photos.

70.     All of the tools described above share a common purpose—room design—but none share similarity in their visual expression and design choices for that purpose. They look different and have unique visual identities, and are easily distinguishable based on look alone. The same cannot be said for Target's room design tool.   Sica Decl., p. 13

71.     When a user begins to explore the design options in the left side menu of both the

DWF and Target interfaces, streamlined, gridded options are provided from which the user can

"click to apply" inside the design space.  *See, e.g.* Bear Decl., ¶ 135.  As shown below, alternative

flooring materials have been identically clicked and loaded into the default room on the right.



72.     For the menu portion of the primary interface, Target (exactly like DWF) chose to

implement a single, unified menu panel along on the left side of a user's screen that does not

overlay, distort or otherwise obscure the design space on the right. This imparts a feeling of

organization and bright, open access.  Items from the menu are neither dragged nor dropped into

the design space but kept distinct; thereby allowing users to simply click or tap a menu item to make it appear – as though by magic – in the room of the design space on the right. Higher level menu categories appear in a clean, monochromatic color scheme labeled with simplified line drawings, and itemized menu options are displayed on the left in both visual presentations, with submenu items visually organized in a grid pattern. *See, e.g.* Bear Decl., ¶ 137.

73.     The format of the DWF tool's menu described above is not necessary to the tool's function as a room planner. Menus do not have to appear as DWF's appear in order to achieve the function of planning a room or selecting room features, or even achieving a streamlined list of options.  The DWF tool menu would also improve in functionality with additional buttons or menus organized in simple lists.  Sica Decl., p. 14.

74.     Target's tool shares 100% of the design elements constituting the distinct visual expression of the DWF tool's menu, appearing to have used what DWF already configured with minimal, simple subordinate alterations. The overall look and feel and behavior of both the DWF's desktop and mobile tool are exactly replicated by Target.  Sica Decl., p. 18.

75.     Target's desktop version of its room design tool menu is unmistakably and substantially similar to DWF's own tool in visual expression.  The desktop main menu is a single, comprehensive panel, it looks clean and highly organized on a grid, it is also monochromatic, giving away a subconscious impression of clarity and simplicity. The menus are the only large item displayed in 2D, and the item always feels open and available to the user. Sica Decl., p. 19.



**Target**                                    **DWF**

76.     By way of further illustration, the following are representative examples of just a few of thousands of possible visual expressions of a menu that are dissimilar to DWF's, further indicating that DWF's design choices (and copying such design choices so closely) are not necessary to the functionality of its tool.  Sica Decl., pp. 25-26.





77.    Had Target developed its own tool from the ground up, rather than relying on DWF's expressive creative visualization, Target's menu display would have taken one of many distinct forms. For example, the menus that Target uses on its main e-commerce website look nothing like those in Target's room design tool and nothing like DWF's menus. If Target had developed the nursey tool from scratch – instead of copying from DWF – it would have maintained consistency with the other portions of its website.  Sica Decl., pp. 26-27.





78.     Unlike Target and DWF, many third-party tools implement menus that are fragmented or in multiple forms.  Sica Decl., pp. 21-23. "Homestyler" is an example of a typical competitive tool with four initial menu forms:



The options are logically grouped together to support the functionality of making things available for selection, but they do not share a visual impression with DWF's tool.

79.    Home Design 3D provides another competitor example:



Here, the menus appear in multiple locations, stack icons on the far left beside sample images, and again support the functionality of making things available for selection, but they do not share a visual impression with DWF's tool. Sica Decl., p. 21.

80.    Other examples of varying menu visualizations of competitors include:



Planner 5d



Williams-Sonoma



Room Planner App



Roomstyler 3D

Sica Decl., pp. 22-24.

81.     The default room in the Target Design Tool (again identically to DWF) is largely optionless in its streamlined rectangular framework, as there is no ability to create a variety of room shapes, curved walls, any angle of intersection beyond 90 degrees, or any other complex design elements.  The default room comes with a single door and a single window.  There are exactly two visible planar (i.e. nominal thickness) walls with baseboards, exactly two invisible walls and no ceiling.  The user's POV (point of view) is centered near the intersection of the top of the two invisible walls. *See, e.g.* Bear Decl., ¶ 136.

 

82.     Target appears to have used what DWF already configured and changed, at most, some of the subordinate graphic elements, such as the type of default floor, floorboard orientation, door type and window type, but the elements are near identical to DWF and create on overall identical look in combination, such as the starting distance and the angle of the room, a single window, the placement of the door and window, walls with no thickness, and white baseboards. Sica Decl., p.18.

83.     The format of the room described above is not necessary to its function as a room planner, or even a subjectively "easy to use" room planner.  The DWF Design Tool would be

equally or more functional if the room was displayed, for example, in 2D. A 2D view would be less demanding on the device processor, and therefore run faster on a less powerful device. It would also be easier to evaluate distances between pieces of furniture in 2D, rather than in 3D. It would also be more functional to be able to visualize how thick the walls are so the user can distinguish between interior and exterior walls and modify the walls, including windows and doors in the room, accordingly (i.e.: a user decorating a room in a cold geography might want to avoid placing a crib beside a thin exterior wall). Sica Decl., pp. 14-15

84.     A square room with an entrance door and single window serves no particular purpose in its default design and was not an obvious, practical, or useful choice: for example, the room could be a blank slate rectangular room by default with no doors or windows or an empty 3D space where no room would be displayed by default (see below), both allowing for customization that better suits users' individual needs. Sica Decl., p. 15..



85.     And, not all rooms have white baseboards with this particular cross section. Examples of common baseboards include:



Sica Decl., pp. ___.

86.     There are numerous visually dissimilar ways to express the idea of a room in an online room planning tool.   DWF's particular expression is not necessary to the higher-level idea's function. Unlike DWF and Target, third party tools often start in a 2D space, sometimes with a wall template and sometimes with no room:





**Roomstyler**                                   **Planyourroom.com**

Planner 5D also starts in a 2D space, and Williams-Sonoma has a tool that allows the creation of rooms with rounded walls.





**Planner 5D tool**                              **Williams-Sonoma tool**

There are no rendered walls, floors, doors, windows, baseboards, or any of the other elements which are present in DWF's default room presentation.

87.     Some of the third party tools allow users to switch into a 3D view but, again, these 3D views look visually distinct from DWF's interface and are not floating in void space, have walls with thickness, no invisible exterior walls, no baseboards, no default windows and doors, and no uniform camera angle and type of perspective (e.g.  2-point or 3-point perspective). For example:

33

 

2-point perspective (all the vertical edges are parallel)          3-point perspective



Planner 5d in 3D viewing mode (3-point perspective, camera parallel to two walls)



Home Design 3D in 3D view (3-point perspective)



William's-Sonoma still-image 3D rendering (2-point perspective)



Room Planner App in 3D view (2-point perspective)



Roomstyler 3D with 3D photo option (circled red above, showing exterior walls rendered using 2-point perspective type).

88.     Again, all of the tools described above share a common purpose—room design for any kind of user—but none share similarity with DWF in their visual expression of that purpose. They look different and have unique visual identities. This is not so for Target's room design tool. Sica Decl., p. 18.

89.     Target's tool further shares 100% of the design elements constituting the feel and visual expression of navigation within the DWF tool, particularly the "constrained orbit" + "LOCKED pan" + "INERTIAL zoom." Target used what DWF already configured, but in this case did NOT change any subordinate elements, not even the starting distance and the angle of the room. Sica Decl., p. 29.

90.     The format of the DWF tool's navigation described above is not necessary to the tool's function as a room planner. This is an arbitrary design choice that, in fact, sacrifices functionality such as the ability to move the camera up/down/left/right clicking on the mouse wheel and dragging the mouse. Moreover, INERTIAL orbiting, panning, and/or zooming is not typically used because it is less precise and responsive. The particular way that DWF implemented navigation in its tool is just one of many other options for achieving functional navigation in an interface. Sica Decl., pp. 27-28.

91.     Unlike DWF and Target, many third-party tools implement different expressions of navigation. For example, Home design 3D (below), like many other, tools, offers a WALK type camera, where the camera stays fixed at eye level so the user can simulate the action of "walking" into a room. Other tools offer a FLY mode, emulating a drone-like camera action. Third party tools also use STANDARD constrained or "free orbit" + "STANDARD pan" + "STANDARD zoom"

for 3D navigation (with no INERTIAL action), meaning third-party tools combine the features of using a free orbit, a standard pan that starts and stops when the user stops pressing the button used to control the pan function, and a standard zoom function that starts and stops when the user stops pressing the button used to control the pan function.  Sica Decl., pp. 28-29.

92.     The 3D navigation of the Homestyler tool is, indeed, "STANDARD constrained orbit" + "STANDARD pan" + "STANDARD zoom".



Sica Decl., pp. 28-29.

93.     The DWF tool (below top) and Target's tool (below bottom), in contrast to third party tools, also look virtually identical and share key design features of invisible walls positioned in between the user's view and the inside of the room:



Target also uses the same disappearing walls when rotating the room in the designer tool:



Sica Decl., pp. 33-34

94.     The invisible wall feature is not predominantly functional or the only way to achieve a view of the inside of a 3D room design, and is not dictated by functionality. It does not help the designer to quickly evaluate and design the space. In my opinion, it would be more functional if the tool was at least showing the windows and the doors on the wall, as shown below.



Making a wall and anything located on it semi-transparent would, in fact, be even better and substantially more useful allowing the users to simultaneously see all of the doors, windows, and the furniture inside the room.  Further, the particular expression of DWF's invisible wall feature is not driven by functionality and here are many other ways to express it. For example, creating a section plane perpendicular to the camera or leaving all the wall edges and the items located on the walls visible, while making the surface of the walls positioned in between the user's view and the inside of the room invisible (see below). Sica Decl., pp. 32.



95.     Unlike DWF and Target, third-party tools offer users the option to hide the selected walls (or adjust their transparency) with a specific command if desired. A common option in room design tools allows the user to slice the space with a plane and move that plane at will. Alternatively, other third-party tools can display semi-transparent walls to keep the complete visual of the room intact.



Vectorworks                              Sketchup



HomeByMe tool semi-transparent walls

Sica Decl., pp. 32-33

96.    The Target Design Tool (just like DWF) provides a "Resize Room" option within the left side menu that has editable width and depth dimension fields with embedded drop-down selection controls and  limited options for setting ceiling height. The only units of measure provided are imperial (foot/inches), not metric (meter/centimeters). When the user changes the values in the dimension fields, the default room is automatically updated. *See, e.g.* Bear Decl., ¶ 64.



97.     This discretionary choice is not functional. It is not possible to create L-shaped rooms. It is also not possible to create complex rooms with curved walls or irregular shapes. It is not possible to add any wall with an angle different from 90 degrees or have rooms taller than 9' or with a pitched roof . This limits the real-world applications of the DWF tool, because obviously rooms are not always square or rectangular with a flat roof. DWF picked four drop-down menus to resize a rectangular room, but they could have had an input box where to insert the size in feet and inches instead. They could also have used a sliding bar. They could also have displayed by default a 2D rectangle and had the user drag one corner of it to change the size, or, in the alternative, display editable input boxes along the rectangle sides. These are just some options among many more possible, sometimes clearly more user-friendly, options. They could have also had a drop-down menu to allow for inputs in either meters or centimeters.  Changing units would be not only more accurate for measurement purposes, but also handy for non-American born users.  Those choices are design elements, distinct from the underlying operation of a resizing feature. Sica Decl., p. 35.

98.     Target uses the same visual look and feel (minimalistic, clean, monochromatic, familiar, providing a sense of clarity and simplicity), changing subordinate graphical elements which do not significantly contribute to the visual impression of the two tools as extremely similar. Sica Decl., p. 38.

99.     In other tools, instead of a "resize room button" the user needs to first create a set of lines representing the walls in a 2D space, in a closed configuration. The walls are then either created with another command or are automatically generated. They do not bear a visual similarity to the DWF resizing option. Sica Decl., pp. 35-37.



Planner 5d sliding scale for dimensions



Home Design 3D dragging corner for dimensions



Room Planner App keypad dimension entry

The free online SketchUp tool allows users to change unit, as shown below:



Room Planner App allows for the creation of rooms of any shape:



Sica Decl., pp. 36-37.

100.    Target's design also precisely mimics the overall DWF look and feel with object interaction that is easy to use, in an immersive, game-like environment. As discussed above, when menu items are clicked or tapped, they appear in the room to the right. As shown below, selecting an object within the design space (by clicking or tapping on it) opens an in-context object menu that again reflects DWF's minimalist and streamlined overall look.  Arrow buttons on the in-

context object menu are situated below the object; two opposing arrows in both implementations. Identically, the arrow buttons may either be clicked or tapped repeatedly to achieve minor movements of the selected object or held for a long press to effectuate a continuous rotation of the object.



**DWF**                    **Target**

101.   In addition, the walls of the Target room create a visible object movement boundary, and objects cannot venture outside of, intersect or otherwise break through the walls. Regardless of where the user attempts to drag an object, it will only move within the room or glide along the walls. This is also identical to the DWF interface, but different from many other competitor tools.

102.   Target implemented identical discretionary visual effects for object interaction with other objects. For example, décor items like pillows and toys are designed to automatically layer on top of graphics for things like rugs, tables, and chairs as in the image below showing a pillow on a chair.  When a user drags an object like a pillow around the room, the Target interface effect also visually appears to instantly "jump" up vertically and rest on top of the object below it vertically in the room, as if gravity were in play. *See, e.g.* Bear Decl., ¶ 141.



103.    The specific overlapping and movement in DWF's design is not required for functionality or even for an easy-to-use room design tool. These are discretionary additions and the DWF design tool would work equally well without these precise movements and automations. The DWF tool performs as DWF hopes users might want it to work, but there is no standardized or established consumer preference for how objects are placed and moved within an interface. There are many other ways to achieve object placement and movement in computing environments. Sica Decl., p. 39.

104.    Other third party tools, even professional tools where one might expect more standardization among industry participants, perform differently (i.e., without automated layering or flowing object movement). For example, the image below (SketchUp) shows three overlapping objects: Sica Decl., pp. 39-40.



Other examples include:



Planner 5d



Roomstyler 3D

105.    Just like DWF's streamlined and minimalist, game-like look and feel, Target also

implemented the below three-part user guide. Both are visually presented as a 3-part triptych.

47

Target's visual triptych guide is proceeds identically left-to-right as DWF does. The overall color palette in both is extremely neutral, and the design aesthetic is semi-realistic but more cartoon-like and abstract than the actual programs. *See, e.g.* Bear Decl., ¶ 143.



106.    The "How it works" section is a simple graphic/written portion of the interface which "dresses" the tool, and its visual expression has nothing to do with the function of providing users instructions.  There are hundreds of ways to visually represent instructions in an interface that do not require visual similarity to DWF's tool. Sica Decl., pp. 41-42.  Third-party software offers many examples of different variations on instructions and tutorials:



Tutorial example





107.    Due to the extent of copying, the Target Design tool even maintains DWF's identical glitches in the interface, allowing insertion of window treatments where there are no windows, and with surprisingly identical proportions to those of the DWF interface.



Sica Decl., p. 43.

108.    Just like DWF, Target also made the online Target Design Tool accessible and useable via a mobile web browser.  Users can access the Target Design Tool website on their

49

mobile phones with full access to the features of the tool. Aspects of each visualization were altered in the same ways for the mobile interface. Target's design clearly mimics the expression DWF used to embody the idea of a design tool for a mobile web browser. As shown below, and identically to DWF, the basic elements of the website remain – a design space with the same default room and a menu that does not obscure the design space. In contrast to the web version, however, (again, just like DWF) the menu appears at the bottom of the screen, and when expanded it pushes and shrinks the design space upward on the screen without obstructing it. Menu options appear with the same visual impression as the web version, monochromatic, illustrated icons, in a gridded layout.



109.     On or before January 11, 2021, Target implemented a design tool focusing on college dormitory spaces (http://www.target.com/room-planner/college) that is substantially indistinguishable from the Infringing Design Tool, further violating DWF's copyrights. A true and accurate screenshot of the Target college room planner follows:



110.    On or before March 2, 2021, Target implemented a design tool focusing on outdoor

spaces (http://www.target.com/room-planner/outdoor) that is substantially indistinguishable from

the Infringing Design Tool, further violating DWF's copyrights.  A true and accurate screenshot

of the Target college room planner follows:



111.    Target has since expanded its room planner to act as a "home planner," marketed

as allowing design of home spaces such as bedrooms, dining rooms, home offices, living rooms,

nurseries, outdoor spaces, and "other" areas.   www.target.com/room-planner?createSpace=true. All spaces (with the exception of a slightly modified version for the "outdoor space") utilize the same default room configuration as the nursery room alleged herein and is, on information and belief, an expansive use of the design tool that did not involve recoding (and simply changes the purchasable items available to add to the room, to match the type of room).

112.   The foregoing features and design elements for the DWF Design Tool are distinctive and non-functional, as is the combination of these features to create a unique look and feel for the DWF Design Tool.  They are the result of numerous discretionary creative and expressive selections to create a product that as a whole offers an enjoyable user experience that is also aesthetically pleasing. This is a significant overlap, virtual identity and substantial similarity of the Infringing Design Tool with the DWF Design Tool's expressive content, which cannot be and is not coincidental but the result of Target's extensive copying. *See* generally, Sica Decl. and Bear Decl.

113.   Dozens of Target employees and representatives at different locations have been active on the DWF Design Tool since at least as early as the fall of 2019. Overall, hundreds of hours of session time on the DWF Design Tool have been logged by users from and related to Target since that time, including product designers, art directors, UX/UI designers, senior CGI artists and more. Such users created and shared many rooms with each other and checked virtually every element of the DWF Design Tool user experience and application. *See generally*, Bear Decl., ¶¶ 148-168.

114.   Several Target users signed up with their Target e-mail addresses and many used IP addresses related to Target from Chicago, Minnesota and Bengaluru (Bangalore), India.  Target

has authority over and responsibility for such employees and agents acting on behalf of Target and any of its affiliated companies. Bear Decl., ¶ 149-51.

115.    Target conducted stress tests on the DWF Design Tool to figure out its capabilities. While expectant parents often create rooms with names like "Jays room" or "Lilys room", Target's employees created rooms with names like "demo1" and "test2". And, while most legitimate rooms are created with a standard setup of bed, dresser, and the like, Target employees' rooms were loaded with complex graphics by Target CGI artists to stress rendering and other technologies. Bear Decl., ¶ 152.

116.    Target engineers from India opened browser developer tools many times during sessions, upon information and belief, to reverse engineer the product as much as they could, check product capabilities, and view code and code library stacks visible only through use of such developer tools, all of which  are prohibited by the DWF Terms of Use.  These engineers had access to determine which libraries the DWF Design Tool uses, the room data structure, API calls and aspects of the computer code. Engineers opened developer tools many times, specifically at the exact moments where HTTP requests were sent in order to investigate API calls and network flow.  Bear Decl., ¶ 153-155.

117.    Target employees were particularly active from October of 2019 through the launch of the Target Infringing Design Tool, creating spikes in activity related to product specification of the Target nursery product, product development and prelaunch testing. Bear Decl., ¶ 156.

118.    DWF has never done any marketing in India.  Between launching in April 2018 and October 2019, the DWF Design Tool had less than five entries from Bangalore, India, where Target has a major hub, and never more than one per day.  Bear Decl., ¶ 156.

119.     On October 23rd, 2019, Senior CGI Artist at Target, Robert Whitson, shared a room that he made on the DWF Design Tool with people at 31 different IP addresses, many (and perhaps all) of them Target employees. At least 3 of the IP addresses were in India. On the following day, October 24th, 2019, six people from India entered DWF's website, all from Bangalore where a Target hub is located. This was the first time ever that more than one user from Bangalore was recorded on the same day. Bear Decl., ¶ 157-58.  These were all Target employees.

120.     On March 3rd, 2020, 5 people from Bangalore came to the DWF Design Tool, a coordinated group collaborative visit. This was the second time ever that more than one user from Bangalore was recorded on the same day. Two of the five users came via Google Hangouts, meaning they shared a link to the DWF Design Tool in their video meeting.  One of these users accessed the DWF Terms of Use page and was also using a Linux operating system, meaning they were not a "normal" user, but a software developer. Bear Decl., ¶ 159. Thus, five Target team members working in group fashion entered the DWF Design Tool on March 3, 2020 in order to reverse engineer and copy its features, with one of them acting for the group and on Target's behalf by reviewing the DWF Terms of Use for the express purpose of confirming whether reverse engineering or copying was prohibited, but the team learned it was and proceeded anyways.

121.     By way of further example, two Target employees from India entered the DWF Design Tool from jira.target.com in February and March of 2020. Jira is a widely used software development application.  Bear Decl., ¶ 162. It is an enterprise-grade issue tracking tool that allows users to track bugs, resolve issues, and manage software project functions. In the sessions these Target employees looked at the DWF Design Tool wall painting feature to, on information and belief, understand how it was implemented and/or fix a bug in Target's own system.

122.    Similarly, three Target employees from Minnesota visited the DWF Design Tool via confluence.target.com. Bear Decl., ¶ 163. Confluence is a collaboration tool widely used by UX and UI designers, illustrators, and product managers. It is a collaboration wiki tool that stores and organizes all content around the project – from meeting notes to strategy documents and design documents, and IT documentation.  Two out of the three sessions came from a URL as follows: https://confluence.target.com/pages/viewpage.action?spaceKey=3DLABS&title=Onboarding+to +the+Digital+Creative+Visualization. The "ticket" title assigned on the Confluence tool by Target employees was "Onboarding to the Digital *Creative Visualization*" (emphasis added). Bear Decl., ¶ 160. Thus, Target employees visited the DWF Design Tool specifically for the purpose of their development project for the Infringing Design Tool, considered the DWF Design Tool a "creative visualization," and then stole DWF's creative efforts to repurpose for Target's benefit.

123.    All of the foregoing activity indicates industry-wide prohibited UX/UI design copying and reverse engineering of the DWF Design Tool by Target. Bear Decl., ¶ 164-65

124.    Target's access to the DWF Design Tool and heavy investigation thereof up through April of 2020 occurred shortly before the launch of the Target Infringing Design Tool, on which Target employees were working intensely at the time.

125.    On information and belief, given the extent of the visual similarities, Target's underlying software code for the Infringing Design Tool is also strikingly similar to the software code for the DWF Design Tool.

126.    Target's copying of the DWF Design Tool visual presentation and software in publishing the Infringing Design Tool constitutes willful copyright infringement.

127.    The foregoing conduct is also a violation of DWF's Terms of Use set out on the DWF website and available at http://www.designwithfriends.com/terms ("Terms of Use"). A true and correct copy of said terms of use is attached hereto as **Exhibit E**.

128.    The Terms of Use are expressly governed by and interpreted under Delaware law.

129.    The Terms of Use "govern [users'] access to and use of Design With Friends (the "Company") website (the "Site"), any information, text, graphics, animations, images, 3D items and renders or other materials appearing on the Site or made available on the Site (the "Content"), and any services provided through the Site, including, without limitation, the interior design application which, among others, allows our users to design nurseries and other spaces with the use of our Content (the "Services")."

130.    The Terms of Use specify that "[b]y accessing or using the Site, Content, or Services, you agree to be bound by these Terms of Use. If you are using the Services on behalf of an organization, you are agreeing to these Terms of Use for that organization and its authorized users and representing that you have the authority to bind that organization to these Terms of Use."

131.    Target, through its employees and agents, therefore voluntarily accepted and agreed to the applicable Terms of Use by accessing the DWF website and DWF Design Tool.

132.    Target was directly aware of the Terms of Use at least because Target employees specifically accessed and viewed the Terms of Use by visiting the DWF Terms of Use page, including but not limited to the following examples for which DWF maintains associated business records:

a.    An instance of access to the Terms of Use originating from Bangalore, India on March 3, 2020, which further coincides with a second peak of unique website entrances following a Target employee sharing a room design created in the DWF

Design Tool to many others, including Target employees in India. Bear Decl., ¶ 167(a).

   b.   Two additional instances of access to the Terms of Use originating from India (specifically, Ahmedabad and Hyderabad) on May 1, 2020, and May 7, 2020, respectively. Bear Decl., ¶ 167(b).

   c.   An instance of access to the Terms of use originating from Minneapolis via Target's domestic IP Address on July 23, 2020. Bear Decl., ¶ 167©.

133.   It is also generally known today that use of virtually any website requires the acceptance of the website's terms of use (Bear Decl., ¶ 166 ), and Target employees were authorized by Target to conduct online research as part of performing their job duties. But beyond this, Target and its web-savvy employees and agents are sophisticated in the field of website terms of use and limitations on conduct flowing from the same. The Target employees' job responsibilities as, for example, web and software developers, provide them with unique and advanced knowledge of things like website terms of use, and the implied authority to agree to terms of use in viewing online sites to fulfill their job duties. Bear Decl., ¶ 166.As a result, Target further knew or should have known that the DWF Design Tool was subject to Terms of Use and that Target's conduct was improper.

134.   The Terms of Use accepted by Target and its employees and agents require acknowledgement that the DWF website, content, and services, any derivative works thereof, any improvements, enhancements, updates and upgrades thereto and any intellectual property rights in or related to any of the foregoing are and will remain the exclusive property of DWF.

135.    The Terms of Use also require agreement not to attempt to decipher, decompile, disassemble or reverse engineer any of the software used to provide the DWF site, content, or services.

136.    DWF provided Target, through its employees and agents, access to the DWF website and DWF Design Tool whereby their use of the DWF website and DWF Design Tool violated and breached the applicable Terms of Use by, *inter alia*, copying, recording, stress testing, and/or reverse engineering the DWF Design Tool and developing the Infringing Design Tool.

137.    Prior to filing suit, DWF provided notice to Target of its infringement on July 20, 2020.

    a.  Far from Target denying its design tool was built off the back of the DWF Design Tool, Target admitted in response that its employees accessed the DWF website, but nevertheless failed to cease its use and made the nursery tool a cornerstone of its business model to provide for growth of its sales in the midst of the quarantine-driven online pandemic environment and win-out over the online competition.

    b.  Despite multiple letters exchanged, Target doubled down by continually monitoring DWF's website and implementing yet additional design improvements that DWF made – including with regard to the way that the nursery tool and shopping features interacted.

    c.  And as noted above, Target also subsequently launched substantially similar college dorm and outdoor space planner tools in light of the success of the nursery planner.  Thus, Target has not only continued to infringe, but has further copied DWF's iterative creative expressive   choices so Target continues to enjoy maximum benefit from its copying.

138.     Since delivery of the above-referenced letter to Target, Target employees have continued to access the DWF Design Tool, including at least 18 employees between July 20, 2020, and April 2021.

139.     One such user, for example, inspected the DWF Design Tool's room share feature – a feature which Target only added to the Infringing Design Tool after receiving notice of infringement from DWF.

140.     Two Target employees came to the DWF Design Tool on February 22, 2021, via jira.target.com—one from Bangalore and one from Hyderabad. The Target employee from Bangalore came at least three more times up until March 17, 2021, indicating they linked to the DWF Design Tool on a software developer ticket in Jira. The only reason to access DWF's Design Tool in this manner is to reverse engineer it; namely to create a ticket in a platform used to manage Target's own software development. Bear Decl., ¶ 164. Such activity continues to constitute a violation of DWF's Terms of Use over six months after receiving additional actual notice thereof in DWF's July 2020 letter to Target.

141.     Similarly, a Target employee came to the DWF Design Tool on April 4, 2021, via confluence.target.com from Hopkins Minnesota. This indicates the Target employee came from a link in a developer ticket from Confluence. Bear Decl., ¶ 163. Confluence is another tool used by commercial software companies and entities, which is similar to Jira, but more product oriented (as opposed to software development). The only reason to access DWF's Design Tool in this manner is to reverse engineer it; namely to create a ticket in a platform used to manage Target's own software development. Bear Decl., ¶ 164. Again, such activity continues to constitute a violation of DWF's Terms of Use nine months after receiving additional actual notice thereof in DWF's July 2020 letter to Target.

142.    Thus, in light of this ongoing, expanding and intentional infringement by Target, this lawsuit follows.

**COUNT I**
**COPYRIGHT INFRINGEMENT (COMPUTER CODE)**
**(17 U.S.C. §§ 104, 106 and 501)**

143.    DWF incorporates herein and re-alleges all allegations of this Complaint.

144.    Elements of computer programs may be protected by copyright law including both the code for the program as well as the graphical elements.

145.    As to computer software "[w]here there are various means of achieving the desired purpose, then the particular means chosen is not necessary to the purpose; hence, there is [protectable] expression, not idea." If an expressive feature were dictated by functional considerations, then there would not be a number of ways to implement it.

146.    As alleged above, the DWF Design Tool is an original creative expressive work and as such, its computer code constitutes a protectable work under the Copyright Act.

147.    DWF created its DWF Design Tool in Israel and released it first to the DWF website from Israel on April 7, 2018.  The DWF Design Tool was then released from Israel to the DWF mobile application on July 1, 2018. The DWF Design Tool is a foreign work including all original related works by DWF and modifications made from the release date forward.

148.    DWF is the exclusive owner and copyright holder of the DWF Design Tool Works, which include its software code. A true and correct copy of DWF's copyright registrations for the DWF Design Tool software code are attached hereto as **Exhibits B and D**.

149.    A Copyright Office Examiner approved the foregoing submissions for registration pursuant to the statutory requirements for copyright registrability, including a determination that the submissions contained copyrightable subject matter.

150.    DWF's copyright registrations for the DWF Design Tool Works constitute prima facie evidence of the validity of DWF's copyrights therein and of the facts stated in the certificates under 17 U.S.C. § 410.

151.    The DWF Design Tool look and feel is a unique, non-functional visual experience that is not necessary for competitors to replicate in order to provide similar functions, as confirmed by industry experts. Competitors have access to and have used a wide array of alternatives to create room design products that do not have a similar look and feel to the DWF Design Tool and use very different expressive design elements.

152.    Target, through its Infringing Design Tool, has slavishly copied, produced, reproduced works based upon, distributed, and publicly displayed DWF's protected works in the DWF Design Tool software code and API (Application Programming Interface) without DWF's consent.

153.    Target also had access to and did access the DWF Design Tool through DWF's online website, where the DWF Design Tool was displayed, and where Target was able to access DWF's code and API, and copy it.

154.    Target also had access to and a reasonable opportunity to see, and actually did see, the DWF Design Tool software code and API.

155.    Target's Infringing Design Tool code is substantially similar to the original DWF Design Tool code beyond the point of simply sharing a common purpose or basic program structure.

156.    A rebuttable presumption of copying arises because the Infringing Design Tool is so strikingly similar to the DWF Design Tool that a reasonable person would assume that Target

copied from the DWF Design Tool and that there is no possibility of independent creation, coincidence, or prior common source.

157.    Target did not, and does not, have any license, authorization, permission or consent to reproduce or distribute the DWF Design Tool code.

158.    By its actions alleged in this Complaint, Target has directly infringed DWF's copyright in and relating to the DWF Design Tool by reproducing the copyrighted work and distributing the copyrighted work to the public on an unlimited and unrestricted basis without permission in violation of the Copyright Act, 17 U.S.C. §§ 104, 106 and 501.

159.    Target's acts of infringement were and are willful, intentional, and purposeful, in disregard of and with indifference to DWF's rights. Even after notice of infringement, Target continued to expand and repurpose its Infringing Design Tool, including to service dorms and outdoor areas. Certain of Target's modifications (i.e., the sharing feature) to the Infringing Design Tool track and follow close in time to modifications made to the DWF Design Tool, further showing intentional copying.

160.    Target's infringement has been undertaken knowingly, and with intent to financially gain from DWF's protected copyrighted work.

161.    Based on Target's blatant disregard of DWF's notice and demand letter and follow-up correspondence, Target's refusal to acknowledge the damage caused by its copyright infringement of the DWF Design Tool, and Target's continued infringement of the DWF Design Tool, DWF has been harmed and is entitled to recover Target's profits attributable to Target's infringement acts in an amount to be proved at trial.

162.    As a result of Target's wrongful conduct, DWF has sustained and will continue to sustain substantial, immediate, and irreparable injury, for which there is no adequate remedy at law.

163.    Unless the Court restrains Target from infringing DWF's protected work, Target has no future legal impediment to infringing DWF's rights and the harm will continue to occur in the future.  Accordingly, DWF is further entitled to injunctive relief.

<u>COUNT II</u>
**COPYRIGHT INFRINGEMENT (GRAPHICAL INTERFACE)**
**(17 U.S.C. §§ 104, 106 and 501)**

164.    DWF incorporates herein and re-alleges all allegations of this Complaint.

165.    Elements of computer programs may be protected by copyright law including both the code for the program as well as the graphical elements. "Visual or operational design of a website" is protectable as website content "that is perceptible to the users of a particular website." While generalized placement and spacing of a website might not be protectable, that stands in contrast to a protectable graphical interface or display of a program. Graphical interfaces can be copyrighted even if comprised entirely of unoriginal elements. Things like the selection and arrangement of the icons, the layouts of the windows on the screen, and the dialog boxes which comprise the graphical user interface may also constitute protectable expression with respect to its "unique selection and arrangement of all these features."

166.    As to computer software "[w]here there are various means of achieving the desired purpose, then the particular means chosen is not necessary to the purpose; hence, there is [protectable] expression, not idea." If an expressive feature were dictated by functional considerations, then there would not be a number of ways to implement it.

167.     As alleged above, the DWF Design Tool is an original creative work and as such, it constitutes a protectable work under the Copyright Act.  The original creative expressive work also consists of the selection, arrangement and coordination of its constituent elements.

168.     DWF created its DWF Design Tool in Israel and released it first to the DWF website from Israel on or before April 7, 2018.  The DWF Design Tool was then released from Israel to the DWF mobile application on or before July 1, 2018. The DWF Design Tool is a foreign work including all original related works by DWF and modifications made from the release date forward.

169.     DWF is the exclusive owner and copyright holder of the DWF Design Tool Works, which include its visual presentation. A true and correct copy of DWF's copyright registrations for the DWF Design Tool visual presentation are attached hereto as **Exhibits A and C**.

170.     A Copyright Office Examiner approved the foregoing submissions for registration pursuant to the statutory requirements for copyright registrability, including a determination that the submissions contained copyrightable subject matter.

171.     DWF's copyright registrations for the DWF Design Tool Works constitute prima facie evidence of the validity of DWF's copyrights therein and of the facts stated in the certificates under 17 U.S.C. § 410.

172.     The DWF Design Tool look and feel is a unique, non-functional visual experience that is not necessary for competitors to replicate in order to provide similar functions, as further confirmed by the expert declarations attached. Competitors have access to and have used many alternatives to create room design products that do not have a similar look and feel to the DWF Design Tool.

173.    Target, through its Infringing Design Tool, has slavishly copied, produced, reproduced works based upon, distributed, and publicly displayed DWF's protected works in the DWF Design Tool including its visual presentation without DWF's consent.  Target has copied the foregoing original components and arrangement of constituent parts of the DWF Design Tool and their expressive, copyrightable look and feel, constituting virtual identity and more than substantial similarity of that look and feel.

174.    Target also had access to and did access the DWF Design Tool through DWF's online website, where the DWF Design Tool was displayed, and where Target was able to access it and copy it.

175.    Target also had access to and a reasonable opportunity to see, and actually did see, the DWF Design Tool visual presentation.

176.    Target's Infringing Design Tool is virtually identical and more than substantially similar to the original DWF Design Tool, including because an ordinary observer would conclude that Target unlawfully took protectable material of substance and value from the DWF Design Tool. The Infringing Design Tool has captured the copyrighted "total concept and feel" of the DWF Design Tool, beyond the point of simply sharing a common purpose or basic program structure.  It is a virtually identical and more than substantially similar copy of the DWF Design Tool's expression, as opposed to the "idea" of a virtual room that allows users to create interior design renderings, or put another way, the "idea" of an interactive room-designing software program for lay customers.

177.    Alternatively, DWF is entitled to a rebuttable presumption of copying even if apart from facts directly demonstrating access to the DWF Design Tool, because the Infringing Design Tool is so strikingly similar to the DWF Design Tool that a reasonable person would assume that

Target copied from the DWF Design Tool and that there is no possibility of independent creation, coincidence, or prior common source. Expert testimony and the factual specificity they have provided supports that the visual similarities between the DWF Design Tool and the Infringing Design tool are striking and inexplicable but for intentional copying. Third party witness observation from a Williams Sonoma executive that they believed Target's Infringing Design Tool to be powered by DWF further demonstrates their striking similarity.

178.    Target did not, and does not, have any license, authorization, permission or consent to reproduce or distribute the DWF Design Tool.

179.    By its actions alleged in this Complaint, Target has directly infringed DWF's copyright in and relating to the DWF Design Tool by reproducing the copyrighted work and distributing the copyrighted work to the public on an unlimited and unrestricted basis without permission in violation of the Copyright Act, 17 U.S.C. §§ 104, 106 and 501.

180.    Target's acts of infringement were and are willful, intentional, and purposeful, in disregard of and with indifference to DWF's rights. Even after notice of infringement, Target continued to expand and repurpose its Infringing Design Tool, including to service dorms and outdoor areas.  Certain of Target's modifications to the Infringing Design Tool track and follow close in time to modifications made to the DWF Design Tool, further showing intentional copying.

181.    Target's infringement has been undertaken knowingly, and with intent to financially gain from DWF's protected copyrighted work.

182.    Based on Target's blatant disregard of DWF's notice and demand letter and follow-up correspondence, Target's refusal to acknowledge the damage caused by its copyright infringement of the DWF Design Tool, and Target's continued infringement of the DWF Design

Tool, DWF has been harmed and is entitled to recover Target's profits attributable to Target's infringement acts in an amount to be proved at trial.

183.     As a result of Target's wrongful conduct, DWF has sustained and will continue to sustain substantial, immediate, and irreparable injury, for which there is no adequate remedy at law.

184.     Unless the Court restrains Target from infringing DWF's protected work, Target has no future legal impediment to infringing DWF's rights and the harm will continue to occur in the future.  Accordingly, DWF is further entitled to injunctive relief.

**<u>COUNT III</u>**
**BREACH OF CONTRACT**

185.     DWF incorporates herein and re-alleges all allegations of this Complaint.

186.     Target, through its employees and agents, voluntarily accepted and agreed to the applicable Terms of Use by accessing the DWF website and DWF Design Tool, including, without limitation, (i) acknowledging the DWF website, content, and services, any derivative works thereof, any improvements, enhancements, updates and upgrades thereto and any intellectual property rights in or related to any of the foregoing are and will remain the exclusive property of DWF; and (ii) agreeing not to attempt to decipher, decompile, disassemble or reverse engineer any of the software used to provide the DWF site, content, or services.  The content and services of the DWF website include the DWF Design Tool.

187.     DWF provided Target, through its employees and agents, access to the DWF website and DWF Design Tool whereby they violated and breached the applicable Terms of Use by, *inter alia*, utilizing DWF's information, including information whether protected by copyright or not, to outright copy and reverse engineer and develop an intended substitute product or service in order to improperly solicit DWF's existing and prospective customers.

67

188.    Target employees had actual knowledge of, and visited, the DWF Terms of Use page both before and after DWF notified Target of its infringement by letter in July of 2020.  DWF maintains business record evidence reflecting these visits. And Target's own website policy prohibits a user to "reverse engineer…any portion of the Site" or "duplicate" or "copy" "any portion of [] the Site," such that DWF's bar on reverse engineering or copying its site comported with the Target developers' reasonable expectations and express understanding.  Nevertheless, neither the actual and direct knowledge of the Terms of Use by accessing them online or knowledge of the Terms of Use through DWF's July 2020 notice letter stopped Target and its employees from their continuing theft of DWF's Design Tool.

189.    DWF's Terms of Use:

a.      Provided at all relevant times that: "Your access to and use of the Site, Content, and / or Services are expressly conditioned on your compliance with these Terms of Use. By accessing or using the Site, Content, or Services, you agree to be bound by these Terms of Use. If you are using the Services on behalf of an organization, you are agreeing to these Terms of Use for that organization and its authorized users and representing that you have the authority to bind that organization to these Terms of Use."

b.      Provide notice that the "Site, Content, and Services are protected by copyright";

c.      State that a user "may not reproduce, modify or prepare derivative works based upon, distribute, sell, transfer, publicly display, publicly perform, transmit, or otherwise use the Site, Content, or Services, including without limitation, any functionality, user interface or any element thereof, and any screens, buttons, menus etc.";

d.      State that a user "may not copy or modify the HTML code used to generate web pages on the Site";

e.    State that a user "may not use the Site, Content, or Services on or in connection with any other service, for any purpose."

f.    Prohibit any attempt to "probe, scan, or test the vulnerability of any system or network or breach any security or authentication measures";

g.    Prohibit any attempt to "access or search the Site, Content, or Services with any engine, software, tool, agent, device or mechanism other than the software and / or search agents provided by Company or other generally available third party web browsers";

h.    Prohibit any attempt to "decipher, decompile, disassemble or reverse engineer any of the software used to provide the Site, Content, or Services"; and

i.    Prohibit any attempt to "[c]opy, modify, duplicate, create derivative works from, frame, mirror, republish, download, display, transmit, or distribute all or any portion of the Site, Content, or Services in any form or media or by any means[.]"

190.    Target violated these Terms of Use at least by:

a.    Copying, reproducing, duplicating, modifying, displaying, downloading, transmitting, and using the DWF Design Tool via Target's developing and launch of the Infringing Design Tool;

b.    Running stress tests;

c.    Copying and modifying the code used to generate the DWF Design Tool site; and

d.    Accessing the site with developer tools to see things like network calls, code, and libraries, and other means to decipher, decompile, disassemble and reverse engineer DWF's software.

191.    DWF has been and will continue to be damaged as a result and proximate cause of Target's breach of the Terms of Use in an amount to be proved at trial.

192.     DWF has been, and will continue to be, irreparably harmed by this breach of the Terms of Use and are without an adequate remedy at law. Accordingly, DWF is further entitled to preliminary and permanent injunctive relief.

**PRAYER FOR RELIEF**

Plaintiff respectfully requests the following relief:

A.     An award of judgment to DWF on all Counts of the Complaint;

B.     An order preliminarily and permanently enjoining Target and Target's officers, agents, employees, and attorneys and those other persons who are in active concert or participation with Target who receive actual notice, permanently from infringing the copyrighted DWF Design Tool;

C.     An order requiring Target to permanently modify its print, digital, online, and other marketing, advertising, and promotional material, to completely remove its Infringing Design Tool and derivatives, including its design tools for dorms and outdoor areas;

D.     The impoundment of all Target's materials that infringe DWF's copyright, as well as any other articles that contain or embody copies of DWF's original work;

E.     The destruction of all Target's materials that infringe DWF's copyright, as well as any other articles that contain or embody copies of DWF's original work;

F.     An award to DWF of a full accounting for all of Target's profits attributable to the infringement of the DWF Design Tool, as set forth in 17 U.S.C. § 504 and pursuant to Delaware state law;

G.     General, compensatory, consequential and other recoverable damages for all claims;

H.     General, compensatory, consequential and other damages for breach of contract;

I.     An award of costs to DWF under 17 U.S.C. § 505 or as otherwise provided by law;

J.      An award of DWF's attorney's fees as provided by law;

K.      An award of prejudgment interest and post-judgment interest in the maximum amount permitted by law; and

L.      Such other and further relief that this Court may deem just and equitable.

<u>**DEMAND FOR A JURY TRIAL**</u>

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury of all issues so triable.

Dated: November 14, 2022

OF COUNSEL:

Howard Wisnia
WISNIA PC
12636 High Bluff Dr., Suite 400
San Diego, CA 92130
858.461.0989
howard@wisnialaw.com

Ben L. Wagner
TROUTMAN PEPPER HAMILTON
SANDERS LLP
11682 El Camino Real, Suite 400
San Diego, CA 92130
858.509.6010
ben.wagner@troutman.com

Lindsay Mitchell Henner
TROUTMAN PEPPER HAMILTON
SANDERS LLP
600 Peachtree Street, NE, Suite 3000
Atlanta, GA 30308
404.885.3805
lindsay.henner@troutman.com

*/s/ Douglas D. Herrmann*
Douglas D. Herrmann (#4872)
TROUTMAN PEPPER HAMILTON
  SANDERS LLP
1313 Market Street, Suite 5100
Wilmington, DE 19899
302.777.6500
douglas.herrmann@troutman.com

*Attorneys for Plaintiffs Design with Friends, Inc.
and Design With Friends Ltd.*